# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SIDNEY THIBODEAUX, JR. and LINDA THIBODEAUX,<br><br>      Plaintiffs,<br><br>v.<br><br>SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, AND CHEVRON U.S.A., INC.,<br><br>      Defendants | Case No:<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES

COME NOW, Sidney Thibodeaux, Jr. and Linda Thibodeaux ("Plaintiff" or "Plaintiffs"), by and through their undersigned counsel, and for their cause of action against Defendants Syngenta Crop Protection LLC, Syngenta AG, and Chevron U.S.A., Inc., state to the Court as follows:

## I.    NATURE OF THE CASE

1.    This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Paraquat, containing the active ingredient paraquat dichloride or paraquat methosulfate.

2.    Paraquat and/or paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602) is a synthetic chemical compound

1

that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide formulations ("Paraquat" or "paraquat products") in the United States ("U.S."), including the State of Louisiana ("Louisiana").

3.     Plaintiffs maintain that Paraquat is defective, dangerous to human health, unfit, and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

4.     Plaintiffs' injuries, like those striking many similarly situated victims across the country, were avoidable.

5.     From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries, and from approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor of Defendant SYNGENTA AG ("SAG") and/or Defendant SYNGENTA CROP PROTECTION LLC ("SCPLLC"), were engaged, directly, acting in concert with each other, and/or acting in concert with Chevron Chemical Company, previously known as California Chemical Company ("CHEVRON"), in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in paraquat products, and developing, registering, formulating, and distributing paraquat products, for sale and use in the U.S., including Louisiana ("the U.S. paraquat business").

6.     From approximately May 1964 through approximately September 1986, CHEVRON, a predecessor of Defendant CHEVRON U.S.A., INC. ("CUSA"), was engaged, directly and/or acting in concert with ICI, in all aspects of the U.S. paraquat business.

2

7.      Between approximately May 1964 and approximately September 1986, ICI manufactured and sold to CHEVRON paraquat ("ICI-CHEVRON paraquat") for use by CHEVRON, and others to which CHEVRON distributed it, as an active ingredient in paraquat products that CHEVRON and others formulated and distributed for sale and use in the U.S., including Louisiana ("ICI-CHEVRON paraquat products"). As used in this complaint, "ICI" means ICI Limited and various ICI Limited subsidiaries through approximately June 1981 and ICI PLC and various ICI PLC subsidiaries thereafter.

8.      From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC), and most recently SAG and certain SAG subsidiaries (including SCPLLC), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. paraquat business.

9.      From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC), and most recently SAG and certain SAG subsidiaries (including SCPLLC), have manufactured paraquat ("ICI-SYNGENTA paraquat") for their own use, and for use by others to which they distributed it, as an active ingredient in paraquat products that SCPLLC and its predecessors and others have dffistributed for sale and use in the U.S., including Louisiana ("ICI-SYNGENTA paraquat products").

10.      Defendants SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, AND CHEVRON U.S.A., INC. are collectively referred to as "Defendants."

11.      Defendants advertise and sells goods, specifically Paraquat, in the State of Louisiana.

3

12.     Defendants derived substantial revenue from goods and products used in the State of Louisiana.

13.     Defendants expected or should have expected its acts to have consequences within the State of Louisiana and derived substantial revenue from interstate commerce.

14.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Paraquat.

15.     Defendants are authorized to do business in Louisiana and derive substantial income from doing business in this state.

16.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of Louisiana, thus invoking the benefits and protections of its laws.

17.     Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Paraquat, with full knowledge of its dangerous and defective nature.

18.     The expiration of any applicable statute of limitations is equitably tolled by reason of Defendants' fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

## II.    PARTIES

19.     Plaintiffs Sidney Thibodeaux, Jr. and Linda Thibodeaux are citizens and residents of Morrow, Louisiana within St. Landry Parish. Plaintiff Sidney Thibodeaux, Jr. applied and was exposed to paraquat products from approximately 1971 through 2021 in the state of Louisiana, and was diagnosed with Parkinson's Disease in March of 2021.

4

20.     Plaintiff Sidney Thibodeaux, Jr. purchased and used in Louisiana ICI-CHEVRON paraquat products and/or ICI-SYNGENTA paraquat products (collectively, "Defendants' paraquat products").

21.     Plaintiff Sidney Thibodeaux, Jr. used Defendants' paraquat products regularly and frequently on cotton and soybean fields and pastures over a period of many years in Morrow, Big Cane, Goudeau, and Lemoyen, Louisiana within St. Landry Parish.

22.     Plaintiff Sidney Thibodeaux, Jr. was diagnosed with Parkinson's disease caused by many years of regular, frequent, prolonged exposure to paraquat from Defendants' paraquat products, and Plaintiff Linda Thibodeaux has suffered losses of the services and consortium of Plaintiff Sidney Thibodeaux, Jr. as a result of his illness.

23.     SCPLLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly-owned subsidiary of Defendant SAG. As used in this complaint, "subsidiary" means a corporation or other business entity's wholly-owned subsidiary that is or formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

24.     SAG is a foreign corporation with its principal place of business in Basel, Switzerland.

25.     CUSA is a Pennsylvania corporation with its principal place of business in San Ramon, California.

### III.   JURISDICTION AND VENUE

26.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants.

Defendants are incorporated and have their principal place of business outside of the state in which the Plaintiffs are citizens:

      a.     Plaintiffs are citizens of the State of Louisiana;

      b.     SCPLLC is a citizen of the States of Delaware and North Carolina;

      c.     CUSA is a citizen of the States of Pennsylvania and California; and

      d.     SAG is a citizen or subject of the nation of Switzerland.

27.    The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

28.    Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendants sells, markets, and/or distributes Paraquat within Louisiana. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this District, whichs is where Sidney Thibodeaux, Jr. applied and was exposed to paraquat.

## IV.  FACTS

### A.    Defendants and their predecessors

#### 1.    Syngenta Crop Protection LLC and Syngenta AG

29.    SAG is the successor in interest to the crop-protection business of each of its predecessors, AstraZeneca PLC ("AstraZeneca"), Zeneca Group PLC ("Zeneca Group"), ICI PLC, ICI Limited, and Plant Protection Limited ("PP Limited") and their respective crop-protection subsidiaries (collectively, "SAG's predecessors"), in that:

      a.     SAG, and each of SAG's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

6

   b. SAG has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SAG's predecessors.

30. SCPLLC is the successor in interest to the crop-protection business of each of its predecessors, Syngenta Crop Protection, Inc. ("SCPI"), Zeneca Ag Products, Inc. ("Zeneca Ag"), Zeneca, Inc. ("Zeneca"), ICI Americas, Inc. ("ICIA"), ICI United States, Inc. ("ICI US"), and ICI America Inc. ("ICI America") (collectively, "SCPLLC's predecessors"), in that:

   a. SCPLLC, and each of SCPLLC's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

   b. SCPLLC has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SCPLLC's predecessors.

31. At all relevant times, SCPLLC, SCPI, Zeneca Ag, Zeneca, ICIA, ICI US, and/or ICI America was a wholly-owned U.S. crop-protection subsidiary of SAG or a predecessor of SAG. As used in this complaint, "predecessor" means a corporation or other business entity or subsidiary thereof, to which a Defendant is a successor by merger, continuation of business, or assumption of liabilities, that formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

32. At all relevant times, PP Limited was a wholly-owned U.K. crop-protection subsidiary of ICI Limited, an unincorporated division of ICI Limited, or an unincorporated division of ICI PLC.

33. At all relevant times, SAG and its predecessors exercised a degree of control over their crop-protection subsidiaries so unusually high that these subsidiaries were their agents or alter egos.

### 2.    Chevron U.S.A., Inc.

34.    CUSA is the successor in interest to CHEVRON's crop-protection business, in that it has expressly assumed any liability on claims arising from the historical operation of that business.

### B.    Defendants' and their predecessors' involvement in the U.S. paraquat business

35.    ICI Limited discovered the herbicidal properties of paraquat in the mid-1950s; developed herbicide formulations containing paraquat as an active ingredient in the early 1960s; and produced the first commercial paraquat formulation, which it registered it in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

36.    ICI Limited was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

37.    In May 1964, ICI Limited, PP Limited, and CHEVRON entered into an agreement for the distribution of paraquat in the U.S. and the licensing of certain paraquat-related patents, trade secrets, and other intellectual property ("paraquat licensing and distribution agreement").

38.    As a result of the May 1964 paraquat licensing and distribution agreement, paraquat became commercially available for use in the U.S. in or about 1965.

39.    In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new paraquat licensing and distribution agreement that superseded the May 1964 agreement.

40.    In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new paraquat licensing and distribution agreement, effective January 1982, which superseded in part and amended in part the April 1975 agreement.

41.    From approximately May 1964 through approximately September 1986, pursuant to these paraquat licensing and distribution agreements, ICI and CHEVRON acted in concert in all aspects of the U.S. paraquat business.

42.     In September 1986, ICI and CHEVRON entered into an agreement terminating their paraquat licensing and distribution agreement.

43.     Under the September 1986 termination agreement, ICI paid CHEVRON for the early termination of CHEVRON's rights under their paraquat licensing and distribution agreement.

44.     Although the September 1986 termination agreement gave ICI the right to buy, or exchange for ICI-labeled paraquat products, CHEVRON-labeled paraquat products that CHEVRON had already sold to its distributors, CHEVRON-labeled paraquat products continued to be sold for use in the U.S. after this agreement for some period of time unknown to Plaintiffs.

45.     SAG, SAG's predecessors, and subsidiaries of SAG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Louisiana, than all other paraquat manufacturers combined.

46.     From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Louisiana.

47.     From approximately September 1986 through the present, SYNGENTA has:

a.     manufactured paraquat for use as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Louisiana;

b.     distributed paraquat for use as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Louisiana;

c.     formulated paraquat products distributed for sale and use in the U.S., including Louisiana; and

d.     distributed paraquat products for sale and use in the U.S., including Louisiana.

9

C.      The use of paraquat products and Defendants' knowledge thereof

48.      Defendants' paraquat products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' paraquat products for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

49.      Defendants' paraquat products were commonly used multiple times per year on the same ground, particularly when used to control weeds in orchards and in farm fields where multiple crops are planted in the same growing season or year. At all relevant times, the use of Defendants' paraquat products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

50.      Defendants' paraquat products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' paraquat products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

51.      Defendants' paraquat products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which typically contains one or more surfactants, was commonly added by users of Defendants' products, to increase the ability of paraquat to stay in contact with and penetrate the leaves of target plants and enter plant cells. At all relevant times, the use of Defendants' paraquat products as so formulated and/or with such

10

substances added was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

52.    Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' paraquat products. At all relevant times, the use of such equipment for that purpose was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

**D.    Exposure to paraquat and Defendants' knowledge thereof**

53.    When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and others nearby were commonly exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

54.    When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind) and contact with sprayed plants. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and

11

CHEVRON, that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

55.     When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and other persons nearby commonly were exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

56.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

57.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result,

12

paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

58.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

59.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

60.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and

13

did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

61.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

62.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

63.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate

cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

### E.    Parkinson's disease

64.    Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

65.    The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

66.    Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask- like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

67.    Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

68.    There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used. The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells)

in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

69.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

70.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

71.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

72.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

73.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

74.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

**F.    Paraquat's toxicity**

75.    Paraquat is highly toxic to both plants and animals because it causes and contributes to cause the degeneration and death of living cells in both plants and animals.

16

76.    Paraquat causes and contributes to cause the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions—in plant cells, with photosynthesis, and in animal cells, with cellular respiration—that are essential to cellular health.

77.    In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

78.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

79.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of

Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

80.    The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and were known, to SYNGENTA and CHEVRON at all relevant times.

81.    That paraquat is highly toxic to all living cells—both plant cells and all types of animal cells—has been known to science since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known, to SYNGENTA and CHEVRON at all relevant times.

82.    The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which SYNGENTA and CHEVRON should have known in the exercise of ordinary care, and did know, at all relevant times.

83.    The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. SYNGENTA and CHEVRON should have known this in the exercise of ordinary care, and did know this, at all relevant times.

G.    **Paraquat and Parkinson's disease**

84.    Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features characteristic of Parkinson's disease in humans.

85.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

86.    In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

87.    Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that paraquat causes the degeneration and death of dopaminergic neurons.

88.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to paraquat compared to populations without such exposure.

**H.    Paraquat regulation**

89.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

90.    As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

91.     As a general rule, FIFRA requires registrants—not the EPA—to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

92.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.     its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

    b.     its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.     it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

    d.     when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

93.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

94.     Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

95.     However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

96.      FIFRA further provides that "…it shall be unlawful for any person in any State to distribute or sell to any person… any pesticide which is… misbranded." 7 U.S.C. § 136j(a)(1)(E).

97.     A pesticide is misbranded under FIFRA if, among other things:

    a.     its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.    the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

c.    the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

98.    Plaintiffs do not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA.

99.    Plaintiffs bring claims and seek relief in this action only under state law. Plaintiffs do not bring any claims or seek any relief in this action under FIFRA.

## V.  <u>CLAIMS</u>

### A.  BREACH OF DUTY IN THE MANUFACTURE UNDER THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA)

100.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

101.    Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Paraquat, including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

102.    Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Paraquat because Defendants knew, or should have known, that exposure to Paraquat was linked to Parkinson's Disease, and was therefore not safe for use by consumers.

103.    Defendants failed to exercise due care in the labeling of Paraquat and failed to issue to purchasers and users adequate warnings as to the risk of serious bodily injury, including Parkinson's Disease, resulting from its use.

104.    Defendants continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that Paraquat posed a serious risk of bodily harm to consumers.

105.    Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care. The characteristic of the product that renders it unreasonably dangerous, the paraquat dichloride or paraquat methosulfate content, existed at the time the product left the control of Defendants.

106.    As a direct and proximate consequence of Defendants' negligence, Plaintiff Sidney Thibodeaux, Jr. sustained serious personal injuries and related losses including, but not limited to, the following:

      a.    Plaintiff Sidney Thibodeaux, Jr.required and will continue to require healthcare and services;

      b.    Plaintiff Sidney Thibodeaux, Jr.incurred and will continue to incur medical and related expenses; and

      c.    Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, loss of consortium and other losses and damages.

B.    **MANUFACTURING DESIGN DEFECT AND DEFECT IN COMPOSITION UNDER LSA-RS 9:2800.55 AND LSA-RS 9:2800.56**

107.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein

108.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

109.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Louisiana.

110.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated, and distributed Defendants' paraquat products for sale and use in the U.S., including Louisiana.

111.    For many years, Plaintiff used Defendants' paraquat products in Louisiana repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff Sidney Thibodeaux, Jr. to paraquat.

112.    At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to and was known to or foreseen by Defendants and those with whom they were acting in concert, in that:

    a.    they were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used,

    b.    or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    c.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

113.    At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendants and those with whom they were acting in concert and were placed into the stream of commerce.

114.    At all relevant times, Defendants and those with whom they were acting in concert knew or foresaw that this defective condition of Defendants' paraquat products would create a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiffs, continued to place them into the stream of commerce.

115.    As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the gravity of the damage outweighed the utility and the burden on the manufacturer to adopt alternative designs for the product.

116.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to and was known to or foreseen by Defendants and those with whom they were acting in concert.

117.    Plaintiff Sidney Thibodeaux, Jr. could not, by the exercise of reasonable care, discover the defective condition of Defendants' product and/or perceive its defective dangers prior to its use.

118.    Paraquat was a substantial, proximate, and contributing factor in causing Plaintiffs' injuries.

119.    As a proximate result of Defendants' acts and omissions and Plaintiff Sidney Thibodeaux's use of Defendants' defective product, Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this complaint, including, but not limited to, the following:

120.    Plaintiff Sidney Thibodeaux, Jr. required and will continue to require healthcare and services;

121.    Plaintiff Sidney Thibodeaux, Jr.  incurred and will continue to incur medical and related expenses; and

122.    Plaintiffs suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, loss of consortium and other losses and damages.

**C.    INADEQUATE WARNING UNDER LSA-RS-9:2800.57**

123.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

124.    Defendants are also liable to Plaintiffs under a products liability theory based on their failure to adequately warn of the risks of Paraquat.

125.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

126.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Louisiana.

127.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Louisiana.

128.    For many years, Plaintiff Sidney Thibodeaux, Jr. used Defendants' paraquat products in Louisiana repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff Sidney Thibodeaux, Jr. to paraquat.

129.    At all relevant times, Defendants and those with whom they were acting in concert should have known in the exercise of ordinary care, and did know, that when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

a.    Defendants' paraquat products were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

130.    At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert, in that:

a. they were not accompanied by directions for use that would have made paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b. they were not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

131.    At all relevant times, this defective condition or chatracteristic in Defendants' paraquat products existed when they left the control of Defendants and those with whom they were acting in concert and were placed into the stream of commerce.

132.    At all relevant times, Defendants and those with whom they were acting in concert knew this defective condition of Defendants' paraquat products created a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiffs, continued to place them into the stream of commerce.

133.    As a result of this defective condition, Defendants failed to use reasonable care to provide an adequate warning of the defective condition or characteristics and its dangers to users and handlers of the product, such as Plaintiff Sidney Thibodeaux, Jr..

134.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

135.    A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Defendants' failure to do so renders it liable for all damages caused by its

subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff Sidney Thibodeaux, Jr. and other users of the product.

136.    As a proximate result of Defendants' acts and omissions and Plaintiff Sidney Thibodeaux, Jr.'s use of Paraquat, Defendants' defective product, Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this complaint, including, but not limited to, the following:

137.    Plaintiff Sidney Thibodeaux, Jr. required and will continue to require healthcare and services;

138.    Plaintiff Sidney Thibodeaux, Jr incurred and will continue to incur medical and related expenses; and

139.    Plaintiffs suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, loss of consortium and other losses and damages.

**D.    NON-CONFORMITY TO EXPRESS WARRANTY UNDER LSA-RS-9:2800.58**

140.    Plaintiffs repeat, reiterate, incorporate, and reallege each and every allegation contained in this complaint with the same force and effect as if fully set forth herein.

141.    Defendants, through its officers, directors, agents, representatives, and written literature and packaging, and written and media advertisements, expressly warranted that Paraquat was safe and effective and fit for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, Parkinson's Disease and was adequately tested and fit for its intended use.

142.    Specifically, Defendants made the representations as set forth, as well as many others, via advertising, product labels, and information given to the public.

143.    At the time of making such express warranties, Defendants knew and/or should have known that Paraquat did not conform to the express warranties and representations and that, in fact, its product was not safe and had numerous serious side effects, including the possibility of Parkinson's Disease, of which Defendants had full knowledge and did not accurately or adequately warn.

144.    Paraquat, as manufactured and sold by Defendants, did not conform to these representations because it caused serious injury, including Parkinson's Disease, to consumers such as Plaintiffs, when used as directed by the product label.

145.    Defendants breached its express warranties because its product was and is defective for its intended purpose.

146.    Plaintiff did rely on Defendants' express warranties regarding the safety and efficacy of their product in purchasing and using the product, and induced Plaintiff Sidney Thibodeaux to use the product, and Plaintiffs' damages were proximately caused by the untruthfulness of the express warranty.

147.    As a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiffs suffered severe and permanent personal injuries, harm, and economic loss.

**E.    NEGLIGENCE**

148.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

149.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

150.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Louisiana.

151.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Louisiana.

152.    For many years, Plaintiff Sidney Thibodeaux, Jr. used Defendants' paraquat products in Louisiana repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff Sidney Thibodeaux, Jr. to paraquat.

153.    At all relevant times, in designing, manufacturing, and distributing paraquat for use in formulating paraquat products and in designing, formulating, packaging, labeling, and distributing paraquat products, Defendants and those with whom they were acting in concert owed a duty to exercise ordinary care for the health and safety of persons, including Plaintiffs, whom it was reasonably foreseeable could be exposed to paraquat in such products.

154.    When Defendants and those with whom they were acting in concert designed, manufactured, and distributed paraquat for use in formulating Defendants' paraquat products and designed, formulated, packaged, labeled, and distributed Defendants' paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendants should have known, and Defendants did know, that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

      a.    they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of

persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

155.    In breach of their duty to Plaintiffs, Defendants and those with whom they were acting in concert negligently, and in conscious disregard for the safety of others:

a.    failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

b.    designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.    failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.    failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of

31

persons spraying Defendants' paraquat products or nearby during or after spraying;

e.      failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used,or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.      failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

g.      failed to direct that Defendants' paraquat products be used in a manner that would have made it unlikely for paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.      failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

156.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to and was known to or foreseen by Defendants and those with whom they were acting in concert.

157.    Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants's failure to exercise ordinary care, as set forth above.

158.    As a result of the foregoing acts and omissions, the Plaintiff Sidney Thibodeaux, Jr. suffered from serious and dangerous side effects including, but not limited to, Parkinson's Disease, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff Sidney Thibodeaux, Jr. suffered life-threatening Parkinson's Disease and severe personal injuries, which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life.

### F.    FRAUD, MISREPRESENTATION AND SUPPRESION

159.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

160.    Defendants fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff Sidney Thibodeaux, Jr., both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Paraquat products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Paraquat.

161.    The intentional and/or negligent misrepresentations and omissions of Defendants regarding the safety of Paraquat products was communicated to Plaintiff Sidney Thibodeaux, Jr.

directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Paraquat products was also intentionally and/or negligently misrepresented to Plaintiff Sidney Thibodeaux, Jr. and the public with the intent that such misrepresentations would cause Plaintiff Sidney Thibodeaux, Jr. and other potential consumers to purchase and use or continue to purchase and use Paraquat products.

162.    Defendants either knew or should have known of the material representations it was making regarding the safety and relative utility of Paraquat products.

163.    Defendants fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, Sidney Thibodeaux, Jr. and the consuming public to purchase and use Paraquat products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiff Sidney Thibodeaux, Jr. and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Paraquat products. Defendants knew or should have known that Plaintiff Sidney Thibodeaux, Jr. would rely on their false representations and omissions.

164.    Defendants made these misrepresentations and actively concealed adverse information including the risk of Parkinson's Disease, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.

165.    Despite the fact that Defendants knew or should have known of reports of severe risks including Parkinson's Disease, with Paraquat use and exposure, this information was

strategically minimized, understated, or omitted in order to create the impression that the human dangers of Paraquat were nonexistent, particularly in light of its purported utility.

166.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied.

167.    If Plaintiff Sidney Thibodeaux, Jr. had known the facts concerning the risks associated with Paraquat exposure, Plaintiff Sidney Thibodeaux, Jr. would have used a safer alternative.

168.    Plaintiff Sidney Thibodeaux, Jr.'s reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the facts concerning Paraquat while Plaintiff was not in a position to know the facts because Defendants overstated the benefits and safety of Paraquat and downplayed the risk of lymphoma, thereby inducing Plaintiff Sidney Thibodeaux, Jr.  to use the herbicide rather than safer alternatives.

169.    As a direct and proximate result of Defendants's actions and inactions, Plaintiff Sidney Thibodeaux, Jr. was exposed to Paraquat and thus, Plaintiffs suffered and will continue to suffer injuries and damages, as set forth herein.

G.    REDHIBITION

170.    At all pertinent times, including the time of sale and use, the Paraquat products, when put to their intended or reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or

instructions regarding the increased risk of Parkinson's Disease associated with the use of Paraquat products.

171.     The unreasonably dangerous nature of the Paraquat products creates a breach of the warranty against redhibitory defects, or vices, of things sold pursuant to Louisiana Civil Code Article 2520, which states: "A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."

172.     Had Plaintiff Sidney Thibodeaux, Jr. known that the use of Paraquat Products could cause him to develop Parkinson's Disease, he would not have purchased or used Paraquat products. As a direct and proximate result of the redhibitory vices of the Paraquat products, Plaintiffs were damaged.

173.     Due to the redhibitory vices of the Paraquat products, Plaintiff specifically demands all rights and remedies, including damages for economic and other loss, and attorney fees, pursuant to Louisiana Civil Code Article 2520, *et seq*.

### H.     LOSS OF CONSORTIUM

174.     As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' paraquat products, Plaintiff Linda Thibodeaux has been deprived and is reasonably certain to be deprived in the future of the services, society, and companionship of and sexual relationship with her husband.

### I.     EXEMPLARY AND PUNITIVE DAMAGES

175.     Defendants have acted willfully, wantonly, maliciously, fraudulently, and recklessly in one or more of the following ways:

176.     Defendants knew of the unreasonably high risk of Parkinson's Disease posed by the Paraquat products before manufacturing, marketing, distributing and/or selling its Paraquat products, yet purposefully proceeded with such action;

177.     Despite their knowledge of the high risk of Parkinson's Disease associated with use and/or exposure to Paraquat products, Defendants affirmatively minimized this risk through marketing and promotional efforts and product labeling; and

178.     Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of Paraquat products, including Plaintiff Sidney Thibodeaux, Jr..

179.     Defendants knew of the dangers and risks of Paraquat products, yet it concealed and/or omitted this information from labels and warnings contained on Paraquat products in furtherance of its knowing and willful actions.

180.     This was not done by accident or through justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the general population that Paraquat was harmless to humans and that full disclosure of Paraquat's risks would limit the amount of money Defendants would make selling Paraquat in Louisiana.

181.     This was accomplished not only through its misleading labeling but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading.

182.     Defendants' actions and inactions robbed decedent Sidney Thibodeaux, Jr. of the right to make an informed decision about whether to be exposed to Paraquat. Such conduct was done with conscious disregard of Sidney Thibodeaux, Jr. rights.

183.     These actions were outrageous because of Defendants' willful and reckless indifference to the safety of users of Paraquat products and/or those who became exposed to it.

184.    As a direct and proximate result of the willful, wanton, malicious and/or reckless conduct of Defendants, the damages set forth herein were sustained.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against the Defendants on each of the above- referenced claims and causes of action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

2.    Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiffs including health care costs and economic loss;

3.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at the trial of this action;

4.    Awarding exemplary and punitive damages sufficient to punish and deter Defendants and others from future fraudulent practices;

5.    Pre-judgment interest;

6.    Post-judgment interest;

7.    Awarding Plaintiffs reasonable attorneys' fees;

8.    Awarding Plaintiffs the costs of these proceedings; and

9.    Such other and further relief as this Court deems just and proper.

## VII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demands trial by jury as to all issues.

Respectfully submitted,

**Date:** May 13, 2021

/s/ Nicholas R. Rockforte
Nicholas R. Rockforte (LA Bar #31305)
Derrick G. Earles (LA Bar #29570)
David C. Laborde (LA Bar #20907)
Madeleine Brumley (LA Bar #37432)
**LABORDE EARLES LAW FIRM**
1901 Kaliste Saloom Rd.
Lafayette, LA 70508
P: (337) 261-2617
F: (337)261-1934
nicholas@onmyside.com
digger@onmyside.com
david@onmyside.com
madeleine@onmyside.com

*Counsel for Plaintiffs*